**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| UNITED STATES OF AMERICA<br><br>v.<br><br>ALFRED CATINO | 3:12CR117(JAM)<br><br>May 8, 2016 |
|---|---|

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The government respectfully submits this memorandum in aid of sentencing for the sentencing hearing of the defendant Alfred Catino, scheduled for May 16, 2016. For the reasons provided below, this Court should sentence the defendant to 121 months incarceration and a life time term of supervised release.

**INTRODUCTION**

Webster's New Collegiate Dictionary defines the word "incorrigible" as "incapable of being corrected or amended; not reformable." There is no better word to describe this defendant. Since becoming an adult, he has repeatedly, flagrantly and with total disregard for the law committed crimes. He is a life-long, unapologetic drug dealer who, despite opportunity after opportunity to live a law-abiding life, has reverted to the criminal lifestyle over and over again. Moreover, there are virtually no mitigating circumstances that would warrant a departure in this case. The defendant had no addictions, repeatedly preached the dangers of drug addiction to his co-defendants, lived in a lovely apartment in his son's home and was supported by social security income. He dealt drugs and dumped large quantities of poison onto the streets, ruining people's lives, for no other reason than love of the game.

The defendant argues that his age warrants a departure because he is less likely to recidivate. Nothing could be further from the truth. As his criminal history makes plain, if this

defendant is free, he will deal drugs irrespective of his age. He is a recidivist of the worst order, who needs to be incarcerated for a sufficient but no longer than necessary period of time in order to punish him, send a message of general deterrence, and to protect the public as it appears unlikely that any sentence will specifically deter this defendant from continuing his life of crime.

## PROCEDURAL BACKGROUND

On June 14, 2012, a Grand Jury sitting in New Haven, Connecticut, returned a seventeen-count Superseding Indictment,[1] charging the defendant and twelve other individuals with Conspiracy to Distribute and Possess with Intent to Distribute (a) 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(B)(ii), (b) a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(C), and (c) a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(D), all in violation of Title 21, United States Code, Section 846.

On June 24, 2014, the defendant pled guilty to Count One and pursuant to the plea agreement, the parties agreed that the defendant's adjusted offense level was 30, which would subject him to a guideline range of 108 to 135 months' incarceration. As reflected in the plea agreement, this adjusted offense level did not include an additional one-point reduction for acceptance of responsibility as the defendant pled guilty immediately following jury selection. Moreover, since he pled guilty, the sentencing guidelines addressing drug quantities have been

[1] The initial indictment, issued by the same Grand Jury, was superseded to include additional possession and distribution counts and to add defendant Julio Brinez to the conspiracy charge. Moreover, prior to the initial indictment, five defendants, including the defendant, had been arrested pursuant to a criminal complaint issued by the Honorable Holly B. Fitzsimmons for violations of 21 U.S.C. §846.

amended, and hence under those amended guidelines, the parties agree that his adjusted offense level should now be 28. Under the plea agreement's terms – which contemplated that the defendant was a criminal history category II – his guideline range would be 87 to 108 months in prison. Probation, however, determined that the defendant was actually a criminal history III as the defendant committed the instant offense while on supervised release and hence that his guideline range is 97 to 121 months.

## FACTUAL BACKGROUND

### *A. The Instant Investigation*

Starting in the summer of 2011, a DEA Task Force, in conjunction with other law enforcement agencies, conducted an investigation of narcotics trafficking activity in the Norwalk, Connecticut area. Pursuant to that investigation, the DEA obtained authorization to intercept telephone calls occurring over five cellular telephones. Those interceptions revealed a drug trafficking organization that possessed with intent to distribute and distributed thousands of oxycodone pills, more than 500 grams of cocaine, and conspired to possess two hundred pounds of marijuana. The defendant was intercepted on four of these telephones as were other defendants speaking about the defendant and his role in their conspiracy to possess with intent to distribute and to distribute oxycodone, cocaine, and marijuana.

### *B. The Defendant's Role in the Conspiracy*

The defendant shared the role of leader of the conspiracy with co-defendant Demetrios Papadakos. Mr. Catino collected drug trafficking proceeds from his co-conspirators, purchased more narcotics, and then resupplied his drug dealers with drugs for re-distribution to smaller dealer and end-users.

According to a cooperating source ("the CS"), Catino and Papadakos were long-time associates who were working together to run the charged conspiracy. The CS also stated that, immediately prior to the initiation of the wiretaps in this case, Papadakos and Catino travelled to Florida where they were scheduled to purchase several thousand oxycodone pills. According to the CS, Papadakos and Catino ultimately only purchased a fraction of what they had intended to buy because Papadakos gambled and lost a large portion of the funds. This account was corroborated by records from a Florida hotel and casino, evidencing that Papadakos gambled and lost $11,000 during a stay in the final days of January 2012. After this event, the two men continued to participate in the conspiracy through co-defendant "Gus" Zografidis, to whom the defendant supplied cocaine and oxycodone.

The defendant provided oxycodone directly to co-defendants Zografidis and indirectly to Solano for re-distribution. These facts are evidenced not only from the accounts of the CS, but also from intercepted calls or controlled purchases. For example, during the fall of 2011, a DEA confidential informant ("the CI") engaged in the controlled purchase of an ounce of cocaine from defendant Zografidis, during the course of which Zografidis encouraged the CI to purchase 100 oxycodone 15 MG pills. In that conversation, Zografidis generally identified his source for the pills as follows:

KZ: How many do you want, 10 thousand? You got it!
CI: Get out of here!
KZ: [U/I]. Yes.
CI: That much, eh?
KZ: Look. I, I have a very strong, a lot, very strong Dimitri, a lot, a lot! Yes, my man. Yes, fuck [U/I] at all.
CI: Yes, [U/I]… How do they find you, when they have…
[Voices overlap]
KZ: With the French connection. There is only 1 is left. Of the 140, you know the French connection with the heroin, which was the best heroin in the world.

CI: The one they had made a movie about?
KZ: Yes. There is only 1 old man left. He is 80 years old. [U/I] He said to me, I am the only man alive. Everybody has died, he said to me. And he himself has sat in prison for 36 years. Yes, anyway. Look, but he is, you know what he is? He is very careful. And he tells me, "you will do this, this, this and this." And he is what? He is 80 years old now, and he has been slapped in the face galore, so… And he looks after me.

The defendant was arrested in the 1970s and federally prosecuted for heroin trafficking from France. He was also in his seventies at the time of the instant offense.

Moreover, Zografidis's statements were not just puffery. On February 20, 2012 (Session No. 2874 on TT1), Zografidis called co-defendant Vasiliki Papadakos to discuss transporting 2,000 oxycodone pills to her husband (Papadakos) for $7.00 per pill. Zografidis received these pills from the defendant whom Zografidis identified in the call as "the old man". Based on intercepted calls and cooperator testimony, that old man was the defendant who had obtained these pills from his Florida connection.

Likewise, Catino supplied Zografidis with cocaine for further distribution to others as exemplified by their conversation on March 17, 2012 (Session No. 480 on TT4). In this exchange, the defendant called Zografidis and told him "it" would cost the defendant "ten one twenty-five." Immediately thereafter, Zografidis sent the following text to co-defendant John Yerinides (Session No. 8386 on TT1): "We need 5600 for 250." Approximately two hours later, Zografidis called Yerinides and said, "Have ready fifty-six hundred, okay? He is charging us 45 okay? Which is a fucking good price but it is the best. From 1, brings return 92, so that's like ninety-two percent pure." In response, Yerinides simply stated: "Idiot, stop talking about this on the phone." Given the pricing and nature of the conversation, Zografidis was negotiating a 250 gram purchase of cocaine from Catino, half of which he would provide to Yerinides.

As for marijuana, the intercepted calls show that Catino advised Zografidis how to negotiate the purchase and transportation of 200 pounds of marijuana into the District of Connecticut from California. Specifically, Catino advised Zografidis that he (Zografidis) should obtain as much information as possible about the varieties, amounts, and pricing of marijuana available during a trip to Las Vegas, Nevada that Zografidis took in order to meet the marijuana supplier. While the parties were unable to conclude the transaction for lack of transportation, they took various steps to advance the sale. In addition to traveling to Las Vegas to meet with the marijuana distributors, Zografidis received samples of the marijuana via mail and Zografidis and Catino provided the samples to others in an effort to find an end-purchaser. Some of these samples were retrieved from Zografidis's home at the time his arrest, along with more than 80 grams of cocaine, 100 grams of marijuana, oxycodone pills, and a prescription bottle labelled with Alfred Catino Jr.'s name, containing 28 oxycodone pills, 74 white "OC" pills in clear plastic bag, and two black digital scales, one with white powder residue.

### *C. The Defendant's Prior Criminal Conduct*

The defendant has been convicted for federal drug felonies on three prior occasions. On November 1, 1967, the defendant received his first federal narcotics conviction was for selling 115 grams of heroin to a DEA undercover agent. He was sentenced to five years in prison. He was released from prison on November 12, 1970 and in less than three years, he was arrested again for federal narcotics violations. Specifically, he conspired with others to distribute and to possess with intent to distribute two kilograms of heroin. The defendant was convicted and was sentenced for this crime to twelve years in prison.

It was some time before he served this sentence because he absconded to France when released on an appellate bond. When in France, Catino continued his heroin trafficking and the French authorities ultimately arrested and convicted him for this crime and sentenced him to five years in prison on November 13, 1978. On January 21, 1981, the defendant was returned to the United States, where he was charged and convicted of bail jumping and making a false statement in a passport application and unlawful use of a passport, for which, on November 18, 1983, he received a three year sentence to run concurrent with the prior twelve year sentence he was then serving.

Catino received "presumptive parole" on April 14, 1989, but in October 1991, a warrant issued for his arrest based on his continued association with a known felon and his participation in drug dealing activities. Continuing a theme, Catino absconded and another warrant for his arrest issued in November 1991. He was not actually arrested on these charges until December 8, 1995, following his arrest the day before for bribing three witnesses who could identify Marcos Caio as the person who engaged in menacing them with a loaded pistol. On the violations, he served two years in prison until being released in December 1996 to begin five years of supervised release.

While he was incarcerated on his probation violations, he set up the next phase of his narcotics business. Specifically, ***from prison***, he began negotiating a transaction for 125 grams of heroin between a DEA confidential informant ("the CI") and Catino's criminal associates and partners. While that transaction was not completed, Catino met with an undercover DEA agent, who was posing as a large scale heroin customer ("the UC"), at the CI's suggestion. At the meeting, Catino said that he could get any amount of heroin that the UC desired.

That meeting occurred within days of Catino's release from prison. Within the nine months that followed his release, the defendant sold the UC more than one kilogram of heroin and one kilogram of cocaine. For this last offense, he was convicted on May 24, 1999 and sentenced to 140 months in prison and five years of supervised release.

He was released from prison on July 24, 2008 and was arrested in this case on May 8, 2012. He was 71 years old at the time of his arrest.

**DISCUSSION**

As the facts establish, the defendant is a perpetual recidivist, who has committed his long and extensive life to dealing drugs. He has committed these crimes – including the instant offenses – while on supervised release in flagrant disregard of court orders. He has no moral compass, and there is nothing that this Court, Probation or the Government can do to instill him with one. The need to stop him from committing further crimes requires him to be institutionalized for as long as reasonable: 121 months.

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed must be reached through consideration of the advisory Guidelines and all of the factors identified in 18 U.S.C. § 3553(a). In so doing, the Court has a statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)).

The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. §3553

including, but not limited to "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." Accordingly, in determining an appropriate sentence for the defendant, the Court must take into account *all* of the factors delineated in Section 3553.

The crime for which the defendant was convicted and the related crimes that are included in his sentencing calculation were serious in so far as they demonstrate a wild hubris, selfishness, and disrespect for the law. The defendant is a serial felon who has perpetually sold narcotics in large quantities in two different countries over the course of his life. Having been sentenced federally more than four times to a total of more than 28 years of incarceration, there is no reason to believe that any sentence will suddenly have a deterrent effect on him the fifth time around.

Moreover, there are no mitigating circumstances here that would warrant a departure. Unlike Mr. Zografidis and Mr. Papadakos, the defendant was not a drug addict and had no mental defects that affected his ability to conduct his work. In his calls, he was clear-headed, focused and served as a mentor to co-defendants Zografidis and Ribustello. Additionally, there was no reason for the defendant to engage in this conduct. He had a stable upbringing under middle-income conditions; he had a fully grown son, who allowed the defendant to live in his

home; he has a granddaughter; and he had income from social security disability. All of this makes the defendant's conduct more reprehensible; this case is a window into the deficits of his character, deficits which have led the defendant to be a life-long criminal who has not begun to "age out" of criminal activity.

The seriousness of this crime also warrants a significant sentence. In particular, oxycodone distribution is a crime that every day is affecting more and more people. As a serious opiate, oxycodone is highly addictive and people frequently become addicted quite accidentally. Once addicted, people turn for pills to the black market created by those like the defendant and his co-conspirators. When the pills become too expensive, addicts often find themselves turning to heroin or other cheaper alternatives. To sentence this defendant – in light of his history – to less than 121 months in prison would do nothing to deter the influx of illegal prescription pills onto our streets.

In short, the defendant's criminal history and his recidivism, the seriousness of his crime, and the need to deter him and those like him from drug dealing in the future all warrant a 121 month sentence of incarceration in this case.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a 121-month term of incarceration followed by a life time of supervisory release is appropriate and should be imposed in this case.

Dated: May 8, 2016
Bridgeport, CT

Respectfully submitted,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

By: **/s/**
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
Bar Number: PHV 05095
UNITED STATES ATTORNEY'S OFFICE
1000 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2016, a copy of the above submission was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

**/s/**
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
PHV 05095
(203) 696-3000